(C.D. 4577)

UNIVERSAL ACCORDION FACTORY *v.* UNITED STATES

Court Nos. 70/31131, etc.

(Decided December 30, 1974)

*Glad, Tuttle & White* (*Robert Glenn White* of counsel) for the plaintiff.

*Carla A. Hills,* Assistant Attorney General (*Frank J. Desiderio,* trial attorney), for the defendant.

RICHARDSON, Judge: The merchandise in these cases, consolidated for trial, is described on the commercial invoices either as electronic accordions or as accordions. The merchandise was exported from Italy in 1968 and 1969 and classified in liquidation upon entry at the port of Los Angeles, California under TSUS item 725.47 as amended by Public Law 89-241 as other electronic musical instruments at the duty rate of 17 *per centum ad valorem.* And it is claimed by the plaintiff-importer that the mechandise should be classified under TSUS item 725.14 as modified by T.D. 68-9 as piano accordions at the duty rates of 12.5 or 11 *per centum ad valorem,* depending upon date of entry.

The competing tariff provisions read:

[classified]

    Electronic musical instruments:

      \*      \*      \*      \*      \*      \*      \*

725.47    Other _____   17% ad val.

[claimed]

    Wind musical instruments:

      \*      \*      \*      \*      \*      \*      \*

    Accordions and concertinas:

725.14    Piano accordions_____   12.5-11% ad val.

Additionally, the term "Electronic musical instruments" as used in the superior heading to item 725.47 is defined as embracing "all musical instruments in which the sound is generated electrically, and *conventional-type instruments not suitable for playing without electrical amplification, but the term does not include conventional-type instruments, fitted with electrical pick-up and amplifying* devices, when the instrument is suitable for playing without such amplification." [Emphasis added.] See Headnote 2(c), Schedule 7, TSUS, Part 3, Subpart A.

The record in the case consists of the testimony of two witnesses, and documents illustrating models of the merchandise in issue, designated

as MAGICVOX and ELECTROVOX, respectively (plaintiff's exhibits 1 and 2). Two articles were imported, namely, an accordion unit and a foot pedal unit. Silvio Nardoni, president of the plaintiff-importing company testified that the accordion unit could be played without the use of the foot pedal or electricity; and he demonstrated by playing one of the imported accordion units in open court without the use of the foot pedal or electrical hookup. The witness stated the article is a piano accordion and called attention to its 42 treble keys and 120 bass buttons. When the accordion unit is played in the manner demonstrated by the witness the foot pedal unit is not used or connected up to the accordion unit at all.

Mr. Nardoni stated that the accordion unit contained electronic components (tone generators) whose function it is to produce organ-like effects when the accordion unit is played with the use of electricity supplied through the foot pedal unit which connects the electrical power source with the amplifier and the accordion unit together by means of cable connections. The witness testified that the imported articles are commonly used both as an accordion and as an organ at the same time. He stated that the accordion and foot pedal units are imported and sold together, and that an amplifier may or may not be sold along with the other units depending upon whether or not the purchaser already owns an amplifier at the time of purchase. When purchased as a complete system, i.e., accordion, foot pedal, amplifier, the system retails for around $2,200 as compared to the retail price of around $1,800 for a conventional-type accordion, according to the witness.

Mr. Nardoni also testified that the accordion unit was able to produce 6 tonal effects without electrical amplification, and that through activation of the tone generators it was capable of producing an additional 27 tonal effects when connected up with the foot pedal unit and an amplifier. According to the witness the foot pedal functions both as a transformer and as a volume regulator for the organ sounds. However, without the foot pedal and amplifier no sound can be produced from the electronic side of the accordion unit.

Lawrence Larson, a music store owner and professional musician, testified that he has played the accordion unit in issue, and that although he has never sold one he has sold the CORDOVOX, a similar instrument. With respect to the operation of the unit at bar, Mr. Larson testified (R. 47–48):

> Q. You played the accordion part of that instrument. Now, what effect would result if you were to plug that into an amplifier and just use the foot pedal and not use the organ part of it?—
> A. When you played your basses— Like if you went like this (demonstrating), you would get the sound of a base [sic], if you

know the sound of a bass fiddle or electric bass. Instead of this sound, you would get a very deep bass sound, identical to a bass.

Q. Would it be much louder?—A. Much louder.

Q. If it were sent through an amplifier?—A. Right.

Q. Must you pump the accordion to produce the sound?—A. No.

Although both pieces of literature covering the imported articles call attention to the electrical capabilities of the accordion units in issue, exhibit 1, prepared by the manufacturer, treats the accordion unit as two distinct instruments, namely, accordion and electronic organ. But exhibit 2, prepared by the plaintiff-importer, treats the accordion unit as a single instrument, referring to it as "instruments-in-combination."

Plaintiff argues that the imported articles cannot be classified under item 725.47 because they were incapable of producing sound electronically as they were incomplete (at the time of importation) as electronic musical instruments, citing *Montgomery Ward & Co., Inc. v. United States*, 61 CCPA 101, C.A.D. 1131, decided June 27, 1974 [Cust. Bull. Vol. 8, No. 29, page 30].

Additionally, plaintiff argues that the imported accordion units lack a marked electronic construction which would make them exclusively an electronic instrument, and, therefore, cannot be removed from classification under the *eo nomine* provision for piano accordions in item 725.14, citing *Marubeni-Iida (America), Inc. v. United States*, 64 Cust. Ct. 452, C.D. 4019 (1970), and *Montgomery Ward & Co., Inc. v. United States, supra.*

Defendant contends that although the accordion units in issue can be played without electronic amplification they were designed to be operated through an electronic system and, as such, were properly classified under item 725.47, citing *Marubeni-Iida (America), Inc. v. United States, supra.*

In C.A.D. 1131 the merchandise consisted of various components utilized in the manufacture of electronic organs which upon importation into the United States were classified as electronic musical instruments, other, under item 725.47, and claimed to be classifiable under item 726.80 as musical instrument parts not specially provided for. Parts supplied in the United States consisted of cabinets and loudspeakers. The Court of Customs and Patent Appeals held that the omission of the cabinets and loudspeakers (which are "basic elements of an organ") from the importations precluded classification of the imported components under item 725.47, and sustained the claim for classification of the merchandise under the parts provision in item 726.80. With respect to the loudspeakers, the court said (p. 37):

. . . The assumption is that the imported electronic components generate "sound" and that the speaker merely makes it

audible. The imported·components do not generate sound, as the evidence shows and as is well known; they generate electrical currents only. The speaker, which can also be characterized as an electrical device, since it is actuated by the electrical currents fed to it, acts as a transducer to convert electrical energy into sound. Until this occurs, there is no sound. We therefore have to disagree with the lower court's conclusion that the courtroom demonstration "effecitvely [sic] dramatized" how the imported components, when assembled, "generated sound electrically." They generated nothing more than electrical currents and there was no sound but for the added loudspeaker, which was not among the imported articles. We deem it essential to its classification as a "musical instrument"—in the absence of some indication of legislative intent to the contrary—that there be a capability in an organ of producing sound when played upon.

Our appeals court in C.A.D. 1131 also concluded that the cabinetry was an essential part of the organ (functioning as a baffle for the speakers, among other things).

In C.D. 4019 the merchandise was electric guitars (both hollow and solid body types) which were classified under item 725.06 as other stringed [musical] instruments and claimed to be classifiable under item 725.45 as electronic musical instruments. In sustaining the importer's claim under item 725.45 the court found that sound in the guitars was produced electronically by the vibration of steel strings, which vibration was picked up by so-called "pickups" and circulated through the electronic system which consisted of a separate amplifying system. The court noted that the imported guitars were different from acoustical guitars in use, construction, tone and sound characteristics. The court concluded that although the guitars could be played without amplification, such usage was suitable only for practice purposes, as the guitars were designed to be operated through the electronic system, and were not meant to be played without amplification.

In the instant case, apart from the matter of instrument usage, the evidence conclusively establishes that some portion of the sound emanating from the imported accordion units in combination with other components can only be produced electronically, namely, the organ sounds. The record shows that this electronic sound is produced through activation of the tone generators housed in the accordion unit when that unit is connected up with the foot pedal unit and an amplifier, with the foot pedal cable plugged into a suitable source of electrical power. In the opinion of the court the operation of the accordion units in this fashion comes within the language of Headnote 2(c) of Schedule 7, TSUS, Part 3, Subpart A, inasmuch as "the sound is generated electrically."

In the opinion of the court the emphasis in the statute is on the method by which sound is produced rather than on the *quantum* of

sound produced by a particular method. And there is no suggestion in the instant case that the organ section of the accordion unit is not an integral part of the instrument in terms of design and usage. Certainly, in the case of an accordion, any sound not derived from activation of reeds by means of a bellows can hardly be deemed the product of a piano accordion. Indeed, it is to be noted that the manufacturer in its instructional literature (exhibit 1) describes the accordion unit as an "electronic accomplishment" with full awareness of its limitations. So too, this court deems the imported accordion units when assembled with other units (which were not imported with it) to be electronic musical instruments as that term is used in item 725.47.

The question of whether the imported articles were capable of being played as an electronic musical instrument in the condition in which they were imported does not appear to have been considered in C.D. 4019 although it was established in the record there that the imported electric guitars were sold separately from the amplifying system which formed part of the electronic system, and that the guitars themselves were not capable of producing sound. However, this question was at the core of the recent decision of our appeals court in C.A.D. 1131 when that court took the position that a capacity to produce the electronic sound at the time of importation is the *sine qua non* for classification of a musical instrument under item 725.47.

In the instant case the trial demonstration was confined to an illustration of the conventional accordion, owing to the fact that the foot pedal unit which had been imported with the accordion unit was not in court. However, the demonstration without the use of the foot pedal serves to underscore testimony in the record which establishes the fact that without the foot pedal and an amplifier the accordion unit is incapable of producing electronic sound. Thus, from the standpoint of electronic sound the instant importations are on the same footing as were the organ parts in C.A.D. 1131, i.e., they are incomplete components in the production of electronic sound.

In C.A.D. 1131 the court ruled that in the electronic musical system there involved sound was generated by the loudspeakers. In the instant case it would appear from the evidence that the electronic sound is also generated by the speaker system. In this connection the witness Nardoni testified on cross-examination (R. 27–28) :

Q. Well, I direct your attention to Plaintiff's Exhibit 2. I believe on the lower right-hand side there is a Universal Amplifier illustrated, is that right ?—A. Yes.

Q. Do you normally sell that amplifier with the accordion ?—A. Yes. If the user or buyer has an amplifier, he doesn't need another amplifier. This is an amplifier that we had made here in this country and that we market, but we think it compliments [sic] the particular instrument here.

214

Exhibit 2 contains the following statements, among others, concerning the Universal amplifier mentioned in Mr. Nardoni's testimony:

> Designed to maximize the full frequency range and versatility of the ELECTROVOX accordion-combo. Two large, quality speakers produce rich, full tones with immediate and dependable response. . . .

Hence, the speaker system by means of which the electronic organ sound is produced is housed in the amplifier which, of course, is external to the accordion unit. In this posture, it is clear, therefore, that in the condition in which imported the involved accordion units were incapable of producing electronic sound even with the accompanying foot pedal units. And since no amplifiers with speaker systems were imported with the accordion and foot pedal units, it follows that the imported articles could not properly be classified as electronic musical instruments under item 725.47 under the reasoning expressed in C.A.D. 1131.

There is no question but that the evidence supports classification of the imported articles as piano accordions. In appearance and performance the accordion units resemble the ordinary, conventional piano accordion that one is accustomed to see and hear. And this image is not changed by the presence of the foot pedal unit whose function, insofar as the accordion is concerned, is to assist in enabling the accordionist, as an option, to amplify the reed-produced accordion sounds, termed electric accordion. This additional function, made possible by built-in electronic circuitry in the accordion unit, is compatible with the *eo nomine* provision for piano accordions in item 725.14 inasmuch as the foot pedal unit is designed and intended to be fitted into the accordion unit by way of its connecting cable. See Headnote 3 of Schedule 7, TSUS, Part 3, Subpart A.

For the reasons stated, the court agrees with the plaintiff that the subject merchandise should have been classified under item 725.14. Plaintiff's claim is, therefore, sustained.

Judgment will be entered herein accordingly.